Howry, J.,
delivered the opinion of the court:
Plaintiff entered into the contract with defendants, set forth as an exhibit to the petition, whereby he was to furnish to the defendants 140,200 cubic yards, more or less, of filter sand deliverable and put in place in the beds constructed for a filtration plant established by the United States for the purpose of filtering the water supplied by an aqueduct for the city of Washington and District of Columbia. Two demands are set forth in the petition. The first item to be considered is for an alleged outlay and the amount of expenditures, shown by the findings to be $9,888.04, arising out of the construction of an additional plant including expenses incurred in the purchase of machinery and tools to carry out certain alleged requirements for an excess quantity of sand under an order appearing in the record.
The second item of the claim is for the net profits, amounting to $29,420.20, which plaintiff says he would have realized had he been permitted to supply an additional 21,506 cubic yards of sand. The contract was approved April 20, 1903.
The total profits of plaintiff on the contract, exclusive of the additional plant and profits claimed on sand not delivered, were $215,858.39. It took plaintiff about 14 months to complete the work and realize from time to time the profits made by him. That he was fortunate in securing a contract almost under the dome of the Capitol upon which he realized so handsomely affords no reason why he should not be reim *438 bursed for the cost of the additional plant and for profits on the sand not delivered (but which he claims he should have been permitted to deliver), if by any fair interpretation of the whole agreement he is entitled to be paid more than he actually received. But these are questions now to be considered in the light of the findings.
As to the first item, the original plant was completed and deliveries under the contract commenced in August, 1904. The construction of the additional plant was commenced on February 24, 1905, and finished May 30, 1905. The last delivery of sand under the contract was in October, 1905, one day previous to the time in which the sand was required to be supplied. The contention of the plaintiff is that this additional plant was made necessary by an order in the form of a letter of the engineer officer in charge and was not necessary to the furnishing of sand under the contract. This order of the engineer officer was' subsequently verbally modified, and the additional plant was not used because not necessary. This letter, dated February IT, 1905, was transmitted to the plaintiff and contained a specified program for the deliveries of sand under the contract. Plaintiff’s further contention is that this letter was binding upon the defendants and constituted such part of the contract that the subsequent modification could not relieve the defendants from its terms. In other words, the contention appears to be that the additional plant was erected to fulfill the requirements outside the contract set forth in the letter as something independent, and that he was damaged by the subsequent modification of the terms of the letter.
The evidence does not establish the fact that this additional plant was built solely for the purpose of taking care of the deliveries of the additional quantity of sand set out in the letter. The findings do disclose that up to the month of February, 1905, plaintiff’s monthly deliveries of sand had been very inadequate. Frequent complaint had been made to plaintiff by the defendants’ officers, and he had been urged from time to time to increase his deliveries, lest the Government would be damaged by the failure of the plaintiff to comply with the contract. By way of meeting the require *439 ments of the defendants’ officers, plaintiff promised to increase his deliveries of sand per month, and as an evidence of his intention to carry out his undertaking according to contract he began the erection of the additional plant. The findings show that as early as the autumn of 1904 plaintiff actually contemplated the erection of the additional plant by telling the defendants’ engineers of his intention. It seems to the court that the erection of the additional plant was the means taken by the plaintiff to insure proper deliveries under his contract. But by a fortunate chain of circumstances plaintiff was enabled to complete his agreement with the output of his first plant, thereby rendering unnecessary the use of the additional plant. The contributing causes of this increased output from the old plant grew out of the better organization of the working force and the operating of the old plant at night for the months of March and April, 1905. It is apparent that at the dime the additional plant was erected the situation relating to deliveries of sand was so uncertain that the engineer officer in charge gave formal notice to the contractor by the letter of February IT, 1905, that the contract would be forfeited or penalities imposed if deliveries were not made more promptly.
The court is of the further opinion that the erection of the additional plant was made necessary by the slow deliveries of sand, and that in providing the means for carrying out the contract with a greater degree of certainty the construction of the additional plant was one of the proper and necessary expenses of the contract. We are therefore of opinion that plaintiff is not entitled to recover on this item.
The second item, relating to the net profits which plaintiff would have made had he been permitted to furnish an additional 21,506 cubic yards, is based likewise upon the letter of February 17, 1905, from the engineer officer. Plaintiff contends that under this letter he was entitled to deliver the full amount of sand set out in the communication, because he says it was a part of the contract. The amount of sand actually delivered in place on the work amounted to 157,725 cubic yards.
*440 The letter appears to be merely a designation of quantity. It sets out the amount of sand which the engineer officer in charge thought might be necessary under the contract for the completion of the work and it also provided for the method of delivery.
Paragraph 296 of the specifications deals with alterations in the agreement. It appears that if the engineer officer in charge deemed it desirable he was authorized to increase or diminish the quantity of work to be done. The last paragraph of this section provides:
* * * “ If the amount of work in any class is increased, such increase shall be paid for according to the quantity actually done and at the price specified for such work under the contract.”
Thus under this section, even though the engineer officer in charge designated a large quantity of work, it appears that the defendants would be resnonsible only for the amount of work actually performed.
In Mitchell's case, 19 C. Cls. R., 39, a contract was in issue which provided that it should be subject to the approval of both of the commanding generals of the division and of the Department of Missouri. The contract was approved by both of these parties. The court held that—
“ It was clearly the purpose of that provision to secure to the high commanding officers a supervision over the matter and to control or prevent the making of such a contract on the part of an inferior officer if they, or either of them, saw fit to do so. When thus made the contract could not be thereafter altered by any officer inferior to those whose approval was necessary in the first place to give validity. They were officers acting for the United States in giving the consent of the defendants to the terms of the contract, and none below them in authority had a right to change the terms of their agreement.”
The court does not deem it essential to the determination of the issue on the item respecting the claim for profits on account of the increase of sand to enter into the question of the necessity of an approval by the higher officers of the Government of the alleged order. In the view we take of *441 the case the matter of quantity was governed by the terms of the original agreement.
If there was any increase outside of the original contract, and a new tentative arrangement was made between plaintiff and subordinate officers who were not authorized to change the agreement, the approval of higher and superior officers became necessary before any arrangement for an increase outside of the original contract became valid.
If we take the contract and specifications together, as we must, it is clear that there was no intention of setting out specifically the exact quantity of sand to be delivered. By paragraph 20 of the specifications it was provided that the quantities given were approximate only and that no claim should be made against the United States on account of any excess or deficiency. The terms of the agreement left it uncertain whether 25 filters or 30 filters should be built by the Government; and the designation of the number of filters was left by the terms of the agreement to the discretion of the engineer officer in charge.
Plaintiff entered into the contract with full knowledge that the quantities of sand were likely to be increased or diminished to a considerable extent. In Bulkey's case, 7 C. Cls. R., 543; 19 Wall., 37, it was held that a certain notice did not amount to an agreement to furnish the amount of supplies specified and that a contractor could not recover the profits which he would have made had the freights withheld been furnished to him.
. In the present case we think the effect of the letter was to signify a purpose on the part of the Government that the additional quantity of sand might be needed, but that the purpose was liable to be changed at any time. “ Pluman affairs are largely conducted upon the principle of implications.” A consideration of the character of the work required to be done in the construction of this filtration plant shows the purpose. The contract provided for the completion of the work in a specified time and its several parts had been let to different contractors. As one of these contractors finished a specified portion of the work that particular piece of it was turned over to the succeeding contractor.
*442 From this it will be seen that it became necessary for the engineer officer in charge from time to time to map out some tentative arrangement by which the various contractors would know what work they were expected to do and in what time.
We are of opinion that the engineer officer in charge had authority to designate a plan of operations for the convenience of all the contractors, and was the authority in writing for them to proceed with the work as directed. In itself this letter did not contemplate a change or modification of the original contract. The circumstances under which the letter was written show the reason for its delivery, because the contractor at that time was not only behind in his deliveries, but was in danger of forfeiting the terms of the agreement whereby the Government would have been justified in the imposition of penalties by further failure on the part of the contractor to make the deliveries more satisfactory. On this item, as well as on the first, we are of opinion that the claimant is not entitled to recover.
In concluding the discussion of the claim of the contractor that there was such an increased quantity of sand called for outside of the contract as to entitle him to compensation by way of profits based upon the letter, the court does not deem it of sufficient importance to the merits to do more than briefly advert to the fifth finding. That finding shows that a conversation took place in October, 1904, between the consulting engineer and the civil engineer, who was the assistant to the chief officer temporarily in charge of the work, at which claimant was present, concerning the change in the specifications as originally prepared and the necessity for an increase in the quantity of sand to be furnished over and above that specified in the contract sufficient to cover the amount of shrinkage of the sand to be supplied under the contract which would ensue after settlement with water. Plaintiff’s, counsel thinks that this finding is material as an essential part of the res gestes to explain subsequent acts and declarations of the contractor, because he says that if a computation was made at all there is necessarily established the further fact that some amount in figures was reached. *443 As a matter of fact, no conclusion was reached with respect to the matter of any increase, for the obvious reason that the work had not, on account of the small amount of sand delivered at the time of this conference between the parties, progressed far enough for an understanding to be had on the subject. The-finding shows that no understanding was had until April 18, 1905, as to any excess amount and for which amount plaintiff was paid. Accordingly, the court excludes the attempt to prove plaintiff’s suppositions and thoughts about the matter as incompetent testimony.
Petition dismissed.